604 So.2d 661 (1992)
STATE of Louisiana
v.
Freddie KING, Jr.
No. KA 91 0802.
Court of Appeal of Louisiana, First Circuit.
June 29, 1992.
*662 Doug Moreau, Dist. Atty. by Chaney Joseph and Lou Daniels, Asst. Dist. Attys., Baton Rouge, for plaintiff/appellee.
Public Defender's Office, Baton Rouge, for defendant/appellant.
Before COVINGTON, C.J., and LEBLANC and WHIPPLE, JJ.
WHIPPLE, Judge.
Defendant, Freddie King, Jr., was charged in a single grand jury indictment with four counts of first degree murder in connection with the shooting deaths of William "Little Man" Tennart, Jr. (Count I), Angela Sumerall (Count II), Crystal Crawford (Count III) and Traci Hunsucker (Count IV), violations of LSA-R.S. 14:30. Defendant entered pleas of not guilty to the charges. On the day trial was scheduled to begin, the state amended each of the counts to a reduced charge of second degree murder in violation of LSA-R.S. 14:30.1. Defendant pled not guilty to these reduced charges and, following trial by jury, was found guilty as charged on all four counts. On each count, the trial court sentenced defendant to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence; and the court ordered that the sentences on Counts I, II, and III run concurrently and that the sentence on Count IV run consecutively to the sentences on the other three counts. Defendant has appealed, urging seven assignments of error:
1. The trial court committed error when it overruled an objection made by defense counsel during the voir dire examination.
2. The trial court committed error when it overruled an objection made by defense counsel during the voir dire examination.
3. The trial court committed error when it allowed State Exhibits S-1 and S-1-A to be introduced into evidence.
4. The trial court committed error when it admitted State Exhibits S-4, S-16, S-28 and S-31 into evidence.

*663 5. The trial court committed error when it overruled an objection made by the defense.
6. The trial court committed error when it sustained the state's objection to a question posed by the defense.
7. The evidence was insufficient to convict defendant of the instant charges.
However, in his brief to this court, defendant expressly abandoned assignments four and five.
The record reflects that the offenses at issue herein occurred during the early morning hours (sometime prior to 6:00 a.m.) of July 27, 1989, at the mobile home of William Tennart, Jr., located at 873 Mt. Pleasant Road in Zachary, Louisiana. On the evening of July 26, Cindy Bacon and her best friend, Crystal Crawford, left a lounge and proceeded with an individual named "Crissie" in her truck to the home of Roger P. Mixon "for a party, for some cocaine, something to stay awake."
Upon arriving at Mixon's home, they knocked at his door and awoke him at about 2:00 a.m. Crissie left Bacon and Crawford at Mixon's residence; and, after drinking a few beers, Mixon agreed to give Bacon and Crawford a ride back to the lounge where Bacon had left her car. After Mixon's car ran out of gas on the way to the lounge, they walked the rest of the way to the lounge, obtained gasoline and dropped Mixon off with the gas at his car. Mixon then drove home.
A few hours later, Cindy and Crystal returned to Mixon's house, to "get cocaine or something to stay awake the rest of the night." Mixon did not have any drugs but informed the women that he knew someone who might. Mixon telephoned Tennart, a known drug dealer with a reputation for sharing drugs and distributing them free of charge. After securing permission from Tennart to bring Cindy and Crystal to Tennart's home, the three drove to the trailer in Cindy's car. Upon arrival at Tennart's mobile home, Mixon knocked at the door, and Traci Hunsucker let them in the trailer.
Tennart came to the front of the trailer, introduced himself, and returned to the back bedroom. Shortly thereafter, Debra London arrived at Tennart's home and introduced herself as "Debbie". London walked around inside the trailer, spoke with Tennart, and left. She soon returned.
Within minutes of the arrival of Bacon, Crawford and Mixon at Tennart's home, the defendant and a taller man, both black males, rushed into the home without knocking. According to Mixon, defendant, Freddie King, Jr., "dropped a gun from behind the taller black man's back", which he described as a semi-automatic pistol similar to the gun identified at trial as State's exhibit S-52. The taller man, who had not yet displayed a weapon, began pulling up his shirt as he walked to the rear of the home.
Holding his weapon in a military stance and exhibiting it in a threatening manner, King told Cindy, Crystal, Traci and Roger not to move. The occupants in the living room remained seated. A gunshot rang out in the rear of the trailer, and King immediately began shooting the four people seated in the living room, firing approximately five to six shots in rapid succession. Roger, Cindy, Crystal, and Traci were all shot. Roger, who was playing dead, heard the sounds of steps toward the rear of the trailer and heard one person say to the other, "Hurry up Joe-Joseph get the shit and let's go." Additionally, Roger could hear the sounds of someone "scavenging around" in the rear of the trailer.
Cindy, who had closed her eyes and put her face down in the couch when the gunshots began in the living room, opened her eyes after the shooting stopped and sat up. She noticed that the defendant was no longer in the living room. She looked at Mixon and told him she was shot and bleeding. Mixon told her to be quiet and pretend she was dead, as the perpetrators were still in the trailer. Cindy complied with his instructions. Defendant and the other perpetrator then returned to the living room and Mixon heard King say, referring to Mixon, "This one is still breathing; he is still alive; what should I do[?]" Mixon then heard the other perpetrator say: "He's dying; he will be dead soon; let's go." Mixon then heard the sound of a bag being zipped up before hearing the perpetrators *664 leave the trailer. Cindy testified that she heard one of the perpetrators make comments about "getting the money" and "everyone being dead".
Judy Gurney testified that she had arrived at Tennart's trailer between 5:00 and 6:00 p.m. on the evening preceding these events with her daughter, Angela Sumerall, to determine whether Tennart would help Sumerall move her trailer to Zachary. She related what had occurred in the master bedroom where she, Sumerall and Tennart were sitting when the shooting began. Gurney stated that a black man whom she had never previously seen suddenly pushed open the door to the bedroom and said, "You sold my gun." The intruder then raised his gun and shot Tennart in the head before immediately turning the gun and shooting Sumerall, who was seated in a chair. As Gurney stood up behind Sumerall, the shots struck her daughter's body with such force that Gurney was knocked backward by her daughter's body toward the bed and closet. As Gurney was falling, the perpetrator fired two shots at her, neither of which struck her. When Gurney fell to the floor, she lay still as if she had also been shot. At this point, a total of four shots had been fired by this perpetrator.
Gurney stated that after the first shot was fired in the bedroom, she heard whoever was in the living room immediately start firing his gun. After the shots were fired, the perpetrator who had fired the shots in the bedroom returned to the living room. Thereafter, Gurney heard what sounded like two voices when the perpetrator came back into the bedroom. At this point, someone shot again; and Gurney felt "it splatter" on her arms. She then heard someone say, "Get the shit and let's go." When the perpetrators again returned to the living room, Gurney heard someone say, "Is everybody dead[?]" and another person reply, "All but him and he's going to die."
At trial, Bacon and Mixon each made a positive in-court identification of defendant, Freddie King, Jr., as the perpetrator who shot the victims in the living room.
After the assailants left Tennart's home, Gurney placed a telephone call to the emergency 911 number to report the incident and request medical assistance for the victims at the crime scene. Gurney was barely able to talk and was assisted by Cindy Bacon during the 911 telephone call. Law enforcement officers from the Zachary City Police Department, and the East Baton Rouge Parish Sheriff's Office (EBRSO), and emergency medical personnel with the Zachary Fire Department and East Baton Rouge Parish Emergency Medical Services all went to the crime scene in response to the emergency 911 telephone call.
Will Tennart, Angela Sumerall and Crystal Crawford died at the crime scene. Traci Hunsucker was transported to a hospital where she later died. Cindy Bacon and Roger Mixon were also transported to the hospital for treatment of their gunshot wounds. Additionally, although she was not physically injured in the shootings, Gurney became hysterical after witnessing her daughter's death and was taken to a hospital for observation.
Investigatory officers were sent to the hospitals to interview Gurney, Bacon and Mixon. The police began developing leads in the case later in the morning following the commission of the offenses. Defendant's arrest followed later that same day, along with the arrests of Joseph "Jobo" Jackson and Mary Debra London. At approximately 6:30 p.m. on the same evening, Jackson accompanied the police to a location in the area of Gore Road where the officers recovered a wallet and two handguns identified as State Exhibits S-51 and S-52, which were inside a brown satchel or bag identified as State Exhibit S-50, which belonged to Tennart.
As part of the initial investigation of the crimes, officers obtained a warrant to search Tennart's mobile home. Items seized during the execution of the warrant included suspected marijuana and cocaine, and drug paraphernalia that was generally found throughout the home. Additionally, two guns identified as State Exhibits S-10 and S-11 were found concealed beneath the bedspread on the bed where Tennart was *665 slain. Two other firearms seized from the home were a 12 gauge shotgun found in a closet and another weapon found on a shelf with a cover draped over the weapon, which were identified as State Exhibits S-8 and S-9, respectively.
Dr. Debra Shackleton Cavalier performed autopsies on the bodies of Angela Sumerall and Crystal Crawford; and Dr. Alfredo Suaraz performed autopsies on the other two victims, William Tennart and Traci Hunsucker. Both doctors testified concerning the fatal gunshot wounds to the respective victims.
Pat Lane, whom the defense stipulated was qualified as an expert in firearms identification, testified at trial that he conducted ballistics tests of S-51, a Ruger revolver, and S-52, a .22 caliber F 1 E pistol. As a result of these tests, Lane stated that he determined that S-68, bullet fragments recovered from Tennart's head; S-71, a bullet found in the ground outside the front of the mobile home; and S-72, a "suspect" .38 caliber bullet jacket from the closet in the master bedroom of the mobile home where Tennart and Sumerall were fatally shot, were all fired from S-51. Additionally, Lane testified that he determined from the tests that S-58, a bullet removed from Bacon's body; S-66, bullet fragments from Crawford's chest; S-69, a bullet from Hunsucker's neck; and S-76, four .22 caliber bullet casings recovered from the living room in the mobile home where Bacon, Crawford, Hunsucker and Mixon were shot, were all fired from S-52.
At the conclusion of the trial, defendant was found guilty on all four counts and filed the instant appeal.

ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO
By means of these assignments, defendant contends that the trial court erred by overruling his objections to the state's use of peremptory challenges to exclude four of the five prospective black jurors in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
In Batson v. Kentucky, the United States Supreme Court held that an equal protection violation occurs when the prosecutor, in the trial of a member of a cognizable racial group, exercises peremptory challenges to remove members of the defendant's race from the jury venire for a discriminatory purpose. In Batson, the Supreme Court also set standards for assessing whether a prima facie case of purposeful discrimination[1] exists and placed the burden on the prosecution, after such a prima facie showing, to come forth with a neutral explanation for challenging black jurors that related to the particular case. See State v. Collier, 553 So.2d 815, 817 (La.1989).
Here, the record reflects that defendant initially raised his Batson claim at the conclusion of voir dire examination of the first panel of twelve prospective jurors. At this point, five members of the twelve-person jury had been selected and sworn. Out of the presence of the jurors already selected and sworn and the prospective jurors yet to be examined, defense counsel stated in support *666 of his Batson claim that the state had used three of its peremptory challenges to remove three of the four black prospective jurors on the first panel. Without the trial court ruling on whether or not defendant had made a prima facie showing of intentional discrimination, the trial court indicated that it would be simpler for the state to give the court neutral explanations for its challenges of the three black prospective jurors. In articulating the state's explanations, the prosecutor stated that two of the excluded jurors both had "similar conviction[s] on [sic] crime." The prosecutor stated that the third excluded juror "was not satisfied she really will give the state an opportunity to prove its case beyond a reasonable doubt" and that "she would have great difficulty believing any witness ... under the influence of drugs". The trial court rejected defendant's Batson challenge and concluded that defendant had failed to show any pattern of racial motivation.
The record further reflects that after jury selection resumed, defense counsel reurged his Batson objection on the basis of the state's use of another peremptory challenge to exclude another black prospective juror. Again, without the trial court ruling whether or not the defense had established a prima facie case under Batson,[2] the prosecutor was prompted by the court to give his reason(s) for challenging this prospective juror. In response, the prosecutor stated that the juror had expressed grave concern as to how this case would affect her and that the state was concerned about her ability to be unemotional in this case involving a victim who was a drug dealer since she had a son who is an addict and may have a hatred for drug dealers. Again, the trial court accepted the prosecutor's reasons as reasonable and race-neutral.
In evaluating whether or not an attorney's explanation for exercising peremptory challenges is race-neutral, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. Hernandez v. New York, ___ U.S. ___, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). The reasons offered to explain the exercise of the peremptory challenges should be deemed race-neutral unless a discriminatory intent is inherent in those reasons. Hernandez, 111 S.Ct. at 1866.
Here, the explanations given by the state for peremptorily challenging the four black prospective jurors were clearly race-neutral. In rejecting defendant's Batson claim, the trial court properly accepted the prosecutor's race-neutral explanations, a choice entitled to great deference on appeal. Our review of the record of the entire voir dire proceeding fully supports the trial court's ruling that there was no purposeful discrimination in this case.
These assignments lack merit.

ASSIGNMENT OF ERROR NUMBER THREE
By means of this assignment, defendant contends the trial court erred by allowing the introduction into evidence of State Exhibit S-1-A, an edited version of the audiotape of the emergency 911 telephone call initially reporting the shootings. He argues that playing the excised version of the audiotape was unnecessary and repetitive, since the individuals whose voices were recorded on the audiotape were witnesses at trial, and contends that the state was clearly trying to gain the sympathy of the jury by playing the tape, arguing that the prejudicial nature of the recording outweighed its probative value.
During the presentation of its case-in-chief, the state introduced the testimony of Sherry Jackson, who received the emergency 911 telephone call, and her immediate supervisor, Lynn Winnie, who assisted Jackson during the call. After Jackson and Winnie each indicated that they had *667 listened to State Exhibit S-1, the original audiotape of the call, and testified that S-1 accurately reflected the call, the jury was retired from the courtroom and the state offered S-1 into evidence. At that point, defense counsel stated to the trial court that the voices of the victims on the tape were hearsay, that the recording was redundant evidence, and that the recording was highly prejudicial, which clearly outweighed its probative value. The state countered that the victim's voices on the tape recording were admissible as excited utterances and that the recording was "very probing" as to what was reported immediately. Noting that the defense was attacking the credibility of the eyewitnesses and their ability to perceive the facts which had unfolded at the time of the shootings due to the witnesses' alleged drug usage, the prosecutor submitted that the recording was very probative since it allowed the listener to hear the condition of two of the eyewitnesses immediately after the shootings.
In admitting S-1, the original, complete audiotape of the emergency 911 telephone call, and S-1-A, the excised version of the audiotape, the trial court noted that S-1-A (the only version of the recording which was played in the jury's presence) was the first part of the 911 telephone call and the only pertinent part of S-1, and that the remaining portion of the recording, consisting of sobbing and crying, had been excised.
We have carefully listened to and reviewed both the original and excised versions of the recording of the emergency 911 telephone call. The excised version consists of approximately the first two minutes of the telephone conversation. While the voices of the callers are indicative of their understandable excitement and obvious emotional trauma from the occurrence, this portion of the recording consists of the basic reporting of the shootings, including the number of shooting victims, the location of the incident, the efforts of the 911 personnel to calm and reassure the callers and a description of the perpetrators as two black men. The remainder of the original recording which was not played to the jury consists of approximately twelve additional minutes of conversation. This portion of the conversation included instructions by the 911 personnel concerning first aid to be administered to the shooting victims and additional assurances by 911 personnel that help would be arriving, which was followed by the last several minutes of the conversation consisting essentially of crying and sobbing by the callers.
Clearly, the excised version of the original recording was admissible under the excited utterance exception to the hearsay rule. LSA-C.E. art. 803(2). Additionally, the excised version of the recording was highly relevant, particularly in light of the defendant's attack upon the eyewitnesses' credibility and the alleged defect in their capacity to perceive the facts at the time of the shootings due to their alleged use of alcohol and/or drugs. Nonetheless, even if relevant, evidence should be excluded if its probative value is outweighed by the danger of unfair prejudice. See State v. Ludwig, 423 So.2d 1073, 1079 (La.1982). See also LSA-C.E. art. 403 detailing other grounds for excluding relevant evidence.
Applying the balancing test in LSA-C.E. art. 403, we conclude that the probative value of the excised version of the recording clearly outweighed any danger of unfair prejudice and any of the other grounds detailed in art. 403 for the exclusion of relevant evidence.
Thus, this assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SIX
In this assignment, defendant argues that the trial court erred in sustaining the state's objection to the attempt by defense counsel during cross-examination of Dr. Debra Shackelton Cavalier to have the doctor read from a recognized text in the field of psychiatry.
LSA-C.E. art. 803(18) provides:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * * * * *

*668 (18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or, in a civil case, relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, such a statement may be read into evidence and received as an exhibit but may not be taken into the jury room.

* * * * * *
Dr. Cavalier, a physician and board certified anatomic pathologist, testified on direct examination concerning autopsies she had performed on victims Sumerall and Crawford, and the causes of their deaths. In an apparent attempt to elicit testimony from Dr. Cavalier in support of defendant's attack upon the credibility of the eyewitnesses and their alleged drug-induced inability to perceive the facts at the time of the offense, defense counsel began questioning Dr. Cavalier concerning her training and knowledge of the effects of drug usage on the human body. Dr. Cavalier testified that she had "some" medical training as to the effects of the use of drugs on humans. In response to defense counsel's questioning, she stated that she had never read the book entitled "The Diagnostic and Statistical Manual of Mental Disorders, DSM3" but that she "believe[s]" it is a recognized text in psychiatry.
The record reflects that at this point, defense counsel cited a particular page from the book and indicated he wanted to question the doctor about the content of the book. The prosecutor then entered an objection. During the bench conference which followed, the prosecutor indicated that the basis for the objection was that the line of questioning was beyond the witness's field of expertise and being undertaken primarily to read the book in the jury's presence. In sustaining the state's objection, the trial court stated that defense counsel would be permitted to question Doctor Cavalier as to whatever knowledge she had on the subject matter in question but that the court would not permit defense counsel to read from the book and then question the witness as to what was read to her.[3]
The learned treatise exception to the hearsay rule in LSA-C.E. art. 803(18) was clearly inapplicable in this situation for two reasons. First, the record reflects that Dr. Cavalier had not been qualified as an expert possessing the requisite capabilities in the particular field needed to evaluate the statements from the book being used in cross-examination. Moreover, the book in question had not been established as a reliable authority by expert testimony or judicial notice in conformity with LSA-C.E. art. 803(18). Under these circumstances, the trial court did not err in refusing to allow statements from the text to be read during Dr. Cavalier's cross-examination.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SEVEN
In this assignment, defendant contends that the evidence is insufficient to support the guilty verdicts rendered herein. Specifically, defendant argues that the evidence was insufficient to prove his identity as the perpetrator. In support of this argument, defendant relies on the absence of any evidence of a pretrial identification of him by any of the eyewitnesses to the instant crimes. Defendant also makes two additional assertions. Defendant first contends that the in-court identifications of him made by Bacon and Mixon at trial were highly questionable as he was the only black male seated at defense counsel's table when the identifications were made. Defendant further asserts that the testimony of Bacon, Mixon and Gurney concerning their observations at the time of the crimes *669 was defective because those observations occurred while the witnesses were under the influence of narcotics and subject to the fear, terror, pain and shock resulting from the shootings.
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged and defendant's identity as the perpetrator of the crime beyond a reasonable doubt. Additionally, where the key issue is an accused's identity as the perpetrator, rather than whether or not the crime was committed, the state is required to negate any reasonable probability of misidentification. State v. Walker, 555 So.2d 25, 28 (La.App. 1st Cir.1989), writ denied, 558 So.2d 582 (La.1990).
Regarding defendant's assertion that he should have been identified through a pretrial lineup and not just an in-court identification procedure, we first note that the record does not disclose that any pretrial lineup was ever conducted after the crimes nor that defendant ever filed a motion to compel a lineup. However, both state and federal courts have held that there is no constitutional right to a lineup. State v. Jones, 565 So.2d 1023, 1031 (La. App. 1st Cir.1990), writ denied, 585 So.2d 565 (La.1991). A pretrial identification is not a prerequisite to an in-court identification. State v. Evans, 512 So.2d 615, 618 (La.App. 2d Cir.1987), writ denied, 516 So.2d 367 (La.1988). Additionally, the lack of a pretrial identification is generally a matter which addresses itself to the weight of a witness's testimony rather than to its admissibility. Jones, 565 So.2d at 1031. Also, in reference to defendant's assertion that Bacon's and Mixon's in-court identifications of him are questionable because he was the only black man seated at defense counsel's table, we note that such a circumstance does not render an in-court identification inadmissible, although the existence of that circumstance is a factor to be considered by the jury in weighing the testimony of the in-court identification. State v. Buie, 477 So.2d 157, 162 (La.App. 1st Cir. 1985).
Here, the in-court identifications made by Mixon and Bacon were positive and unequivocal. Defendant had ample opportunity to and actually did extensively cross-examine both of the witnesses concerning their identification of defendant, including detailed questions through which he sought to attack their credibility and to establish the existence of a possible defect in their sensory or mental capacity as a result of the alleged use of drugs and/or alcohol that might have lessened their ability to perceive the facts to which they testified.[4]See LSA-C.E. art. 607 C and D(1) regarding such an attack of a witness's credibility. See also State v. Luckett, 327 So.2d 365 (La.1975) (on rehearing). This cross-examination was sufficient to remedy any suggestion inherent in the in-court identification procedure.
Finally, we note that even if suggestive identification procedures are proven by the defense, it is the likelihood of misidentification and not the mere existence of suggestiveness which violates due process. State v. Williams, 375 So.2d 364, 369 (La.1979). In connection with his positive in-court identification of defendant, Mixon described the clothing worn by the perpetrators and described defendant as *670 the shorter one, weighing one hundred forty to one hundred forty-five pounds and being "a lot shorter" than the other perpetrator whom Mixon described as being approximately six feet tall and weighing approximately one hundred seventy pounds.
Mixon further stated that he looked at defendant for thirty to thirty-five seconds during the entire incident which lasted sixty to ninety seconds. Mixon also recognized defendant's voice as the same voice he heard when defendant returned to the living room after going into the bedroom at the rear of the trailer where the other shootings had occurred. Concerning the lighting in the living room at the time of the shootings, Mixon stated that some lights were illuminated although the lighting was not as bright as the lights in the courtroom at trial.
In making her positive in-court identification of defendant, Bacon stated that her eyes were focused on defendant the "whole time" before she closed her eyes at the time the shooting began. She stated that she did not pay any attention to what the taller perpetrator did; and she stated emphatically that if she was not sure of her identification of defendant, she would say so. Under these facts and circumstances, we find no likelihood of misidentification in the instant in-court identifications. See State v. Jones, 565 So.2d at 1031.
Viewing all of the evidence, both direct and circumstantial, in the light most favorable to the state, we conclude that any rational trier of fact could have found beyond a reasonable doubt that defendant directly committed the second degree murders of Traci Hunsucker and Crystal Crawford and that he was guilty as a principal to the second degree murders of William Tennart, Jr. and Angela Sumerall. See LSA-R.S. 14:24.
This assignment lacks merit.

PATENT ERRORS
Under the authority of LSA-C.Cr.P. art. 920(2), this Court routinely reviews appellate records for patent error. After reviewing the record, we have discovered patent sentencing errors caused by the trial court's failure to give defendant credit for time served. See LSA-C.Cr.P. art. 880. Accordingly, we amend the instant sentences to reflect that defendant is to be given credit for time served prior to execution of the sentences. See State v. Greer, 572 So.2d 1166, 1172 (La.App. 1st Cir.1990). While we are aware that these sentences are for life without benefit of parole, probation or suspension of sentence, we note and correct the failure to give credit for time served because this failure could make a difference if these sentences are ever considered for commutation and, if a decision is made to commute the sentences, the failure could also make a difference as to when the commutation should take effect.
Resentencing is not required. However, we remand the case and order the trial court to amend the commitment and the minute entry of the sentencing to reflect that defendant is to be given credit for time served on the sentences.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] We note that in Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), a case involving a white defendant, the United States Supreme Court held that the Equal Protection clause prohibits a prosecutor from using peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race, "a practice that forecloses a significant opportunity to participate in civic life." The Supreme Court further held that, while an individual juror does not have the right to sit on a particular petit jury, the juror possesses the right not to be excluded from serving on account of race; and the Supreme Court concluded that any defendant, regardless of his race, may raise the third-party equal protection claims of jurors excluded by the prosecution because of their race.

Under Batson v. Kentucky, which involved a black defendant, the United States Supreme Court set forth the procedure for the establishment of a prima facie case of purposeful discrimination. Under this procedure, a defendant first had to show that he was a member of a cognizable racial group and that the prosecutor had exercised peremptory challenges to remove members of the defendant's race from the venire. Clearly, this initial showing is obviated by the holding in Powers v. Ohio. See State v. Lamark, 584 So.2d 686, 695 n. 5 (La.App. 1st Cir.), writ denied, 586 So.2d 566 (La.1991).
[2] Once a prosecutor has offered a race-neutral explanation for his peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether or not a prima facie case has been made becomes moot. Hernandez v. New York, ___ U.S. ___, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).
[3] The issue before us in this appeal relates to the portion of the trial court's ruling disallowing the reading of statements from the book during Dr. Cavalier's cross-examination; and, thus, we need not and do not express an opinion as to the correctness of the remainder of the trial court's ruling.
[4] Concerning his use of drugs or alcohol on the day of the instant offenses, Mixon stated that he did place a "couple of crumbs" of cocaine into S-57, a pipe used for smoking cocaine, and "put a butane lighter to [the pipe]" but that it was not enough cocaine "to get high on or anything." He further stated that he had not had any other drugs or alcohol earlier that day. Bacon admitted during her testimony that she had ingested a "hit" of acid that was not "real strong" before going to the lounge with Crawford on the evening of July 26, that she had consumed a "half hit of ecstasy tab" which was not very strong and some Xanax. Bacon further testified that she did not take any drugs at Mixon's house before going to Tennart's trailer or after arriving at the trailer and that she felt "like the acid and all that was done (sic) wore (sic) off" at the time of the shootings.