639 So.2d 440 (1994)
STATE of Louisiana
v.
Lynn GALLIANO.
93 KA 1101.
Court of Appeal of Louisiana, First Circuit.
June 24, 1994.
Rehearing Denied August 9, 1994.
*441 Jennifer S. Nehrbass, and Douglas J. Nehrbass, Sr., Lafayette, for defendant-appellant.
John Schoonenberg, Asst. Dist. Atty., Houma, for appellee State of Louisiana.
Before LOTTINGER, C.J., and CRAIN and LeBLANC, JJ.
CRAIN, Judge.
Defendant, Lynn Paul Galliano, was charged by grand jury indictment with aggravated *442 rape, a violation of LSA-R.S. 14:42. Defendant pled not guilty and, after trial by jury, was found guilty as charged. The trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. He has appealed, urging six assignments of error.
Assignments of error numbers one, two, four, and six were not briefed on appeal and, therefore, are considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.[1] Defendant briefed six additional arguments under the headings, "FIRST ASSIGNMENT OF ERROR," "ASSIGNMENT OF ERROR NUMBER TWO," "FOURTH ASSIGNMENT OF ERROR," "FIFTH ASSIGNMENT OF ERROR," "SIXTH ASSIGNMENT OF ERROR," and "ELEVENTH ASSIGNMENT OF ERROR." These alleged errors were not designated in defendant's formal assignment of errors (which consisted of only the six assignments set forth above). Accordingly, these additional arguments are not properly before this Court for review. See LSA-C.Cr.P. arts. 844 & 920; State v. Spell, 399 So.2d 551, 557 (La. 1981).
The record reflects that the instant offense occurred in Houma, Louisiana, on or about June 10, 1992, during the early morning hours. The victim of the offense was a female, approximately thirty-nine years of age.
On the day prior to the offense, defendant and the victim were assisting Tammy Baudoin in moving into an apartment next door to the victim's residence. Later that day after the move apparently had been completed, the victim accompanied defendant to a lounge.
According to the victim she and defendant stayed at the lounge for about forty-five minutes. They left the lounge when the victim asked defendant to take her home. However, defendant indicated to the victim that he wanted to stop at his home to show her something. When they arrived at defendant's home, they exited defendant's vehicle; and the victim followed defendant inside his home. Defendant started locking the house from the inside. At that point, the victim "thought [she] was in trouble." She asked defendant why he was locking the doors. Defendant did not answer her. He started turning off the lights. The victim asked him what he was doing. Again, defendant did not answer her.
Defendant walked to his bedroom. The victim followed him and told him she wanted to go home. Defendant walked to the side of his bed, leaned underneath it, and pulled out a .38 revolver. He put the gun to the victim's head and told her that if she did not do what he wanted he would "blow [her] f[___] brains out." Defendant then pushed her down on the bed, removed his and the victim's clothes and raped her vaginally.
Defendant picked up his gun and left the room. The victim put her dress back on, went to the living room and tried to unlock the doors to get out of defendant's home. Defendant stopped her and told her that she was not going anywhere. He pushed her back into the bedroom and raped her vaginally again.
Defendant then got up, went to another part of the house and returned with a .410 shotgun. Defendant pointed the shotgun at her face. According to the victim, defendant had made a telephone call, which she "presume[d]" was to Tammy Baudoin. Following *443 the call, defendant pushed the victim back into the bedroom and raped her again.
After the third rape, defendant went back into the living room and sat in a chair. Although the victim had no intention of actually riding in defendant's car with him again, in an attempt to get defendant to open the door to his home (so that she could leave), she asked him if he would take her home. Defendant declined the request, stating that he had been drinking. At that point, the victim asked defendant if he would call a taxicab for her. Defendant complied with this request. He unlocked the door and told her to walk down the street to meet the taxicab so as not to cause his dogs to start barking.
The victim walked down the street. Tammy Baudoin drove up. The victim related to Baudoin what had happened to her. Shortly thereafter at about 2:00 a.m., the taxicab driver arrived. The driver testified that the victim told him that she had been raped. He radioed his company's dispatcher and had the dispatcher contact the police.
The record reflects that officers of the Houma City Police Department arrived at the scene shortly after the approximate 2:30 a.m. report of the offense. Detective Ronald Perkins talked with the victim, who pointed out defendant's residence to him.
The police knocked at defendant's door and attempted to get him to answer his telephone. About fifteen minutes after the police had gone to defendant's residence, defendant exited his home. At the scene, after being advised of his constitutional rights, defendant made a statement to Perkins. Defendant admitted to having had sex with the victim, but he maintained that it had been consensual. The officers asked defendant for and received from him a signed consent to search his residence. During the search, the officers seized various items, including the revolver, the shotgun, bedclothes, and hosiery and underpants belonging to the victim. Following his arrest, defendant was taken to the police station. Defendant was again advised of his constitutional rights. After defendant executed an advice of rights form, defendant gave the police a videotaped statement (State Exhibit S-8), wherein defendant again admitted to having had sex with the victim and continued to claim that she had consented to the acts.
Dr. Randall Kenneth Lillich, a medical doctor, physically examined the victim at Terrebonne General Hospital at 4:10 a.m. on June 10, 1992. His examination revealed that the victim had sustained trauma to her vaginal area, consisting of a first degree (two centimeter) tear to the left labium minora and approximately fifty to sixty petechiae of the upper one-half of the vagina. According to the doctor, these physical findings were consistent with the victim's rape complaint; and, while it was not impossible for injuries of the degree sustained by the victim to have been consistent with consensual sexual intercourse, it was "hard for [him] to imagine" such injuries having been sustained due to consensual behavior.
At trial, defendant took the stand in his own defense and related a different version of the facts from that given by the victim. Consistent with his earlier statements to the police, he testified that he and the victim had engaged in consensual sexual intercourse. Defendant testified that, after he and the victim went to his home from the lounge, Baudoin (whom he previously had dated) telephoned him twice at his home; each time Baudoin wanted to know what he and the victim were doing. Defendant further testified that the sexual activity was passionate and that the victim had left a passion mark on each side of his neck.

ASSIGNMENT OF ERROR NUMBER THREE:
By means of this assignment, defendant contends that the trial court erred "in refusing to permit defendant to call Laurie Clement [as a character witness on his behalf] in fear of having Tammy Baudoin testify in `rebuttal'." Defendant submits that the trial court's action denied him his constitutional right to call witnesses in his behalf.
The record reflects that, prior to trial, the state disclosed by written notice its intention to introduce other crime evidence, i.e., that defendant had committed a rape against Tammy Baudoin approximately three months prior to the charged offense. The notice further disclosed that the purpose of introducing *444 the other crime evidence was to prove motive, plan, knowledge, intent and state of mind and not that defendant is a bad person. The record further reflects that the trial court held a pretrial hearing on the matter and ruled that the other crime evidence would be inadmissible at trial.
At trial, during defendant's presentation of his case, the jury was removed from the courtroom at defense counsel's request. At that point, defense counsel indicated that he had intended to call Laurie Clement as his next witness to establish that a previous relationship between defendant and Clement was not "anything out of line that would indicate an attempt to rape or an attempt to have unconsented to (sic) sexual intercourse with her." Relying on LSA-C.E. art. 404 A(1) and Official Comment (d) to that article, the trial court implicitly ruled that such testimony by Clement was admissible, stating that if Clement testified that any sexual relations she had with defendant were consensual and not by force, this testimony would open the door for the state to present Baudoin's testimony in rebuttal. Defense counsel objected to the ruling and stated that he would not call Clement as a witness. Regarding his objection, defense counsel acknowledged that if Clement had been allowed to testify Clement would have testified that defendant had never forced himself upon her and that any relationship she and defendant had was voluntary and with consent of both parties.
LSA-C.E. art. 404 A generally disallows admission of evidence of a person's character or a trait of his character for the purpose of proving he acted in conformity therewith on a particular occasion. However, as a limited exception to the general rule, Article 404 A(1) allows admission of evidence of a pertinent trait of an accused's character, such as a moral quality, offered by him or by the prosecution to rebut the character evidence; provided that such evidence shall be restricted to showing those moral qualities pertinent to the charged crime and cannot destroy conclusive evidence of guilt. For this exception to apply, the requirements of LSA-C.E. article 405 also must be met. Generally article 405 allows a party to prove a person's character with testimony as to "general reputation" only, and a particular foundation is required. LSA-C.E. art. 405 A & C. In this case, defendant never attempted, nor expressed a desire, to meet these requirements. To the contrary, the record reflects that the character evidence defendant sought to introduce was by specific instances of alleged good conduct and not a pertinent trait of his character provable by testimony as to general reputation only. Thus, the testimony sought to be introduced was inadmissible under LSA-C.E. art. 404 A(1).
On the other hand, proof of character by specific instances of conduct is admissible but only "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense such as in a prosecution for defamation or when there is a defense of entrapment." See State v. Martin, 582 So.2d 306, 314-315 n. 4 (La.App. 1st Cir.), writ denied, 588 So.2d 113 (La.1991). Proof that defendant did not attempt to rape or engage in non-consensual sexual intercourse with someone other than the victim was clearly not an essential element of the charged offense or a defense to the charge and, therefore, was not admissible under article 405 B.
Hence, we find that the trial court erred to the extent that it implicitly ruled that the testimony anticipated from Clement was admissible. Nevertheless, under these circumstances in which the trial court's ruling would apparently have allowed defendant to elicit the inadmissible testimony, but defendant chose not to elicit the testimony, defendant was clearly not prejudiced. Moreover, we believe that, if defendant had chosen to elicit the testimony at issue, defendant would have opened the door to similar contradictory testimony in rebuttal, i.e., the testimony of Tammy Baudoin concerning her alleged rape by defendant.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FIVE (number seven in defendant's brief):
By means of this assignment, defendant contends that the trial court erred by denying *445 his motion for new trial.[2] One of the grounds urged in his motion for new trial consisted of an allegation that "certain members of the jury were seen speaking with other persons at the break [recess of the trial] and due to the relationship observed between the prosecutrix' mother and this person, it is believed that perhaps information was transferred to the jury that should not have been." In support of this claim of improper extraneous jury influence, defendant generally directs this Court's attention to testimony given (at the hearing on the motion for new trial) by his sister Anita Walgamotte and three female jurors, Gina Farrington, Evelyn Lewis and Gwen Tivet.
A juror who considers evidence not developed or admitted at trial violates his sworn duty and may be guilty of misconduct. State v. Thibodeaux, 509 So.2d 800, 804 (La. App. 1st Cir.1987). Our courts are required to take evidence upon well pleaded allegations[3] of prejudicial juror misconduct violating an accused's constitutional right to due process, to confront and cross-examine witnesses or to a trial by a fair and impartial jury and to set aside the verdict and order a new trial upon a showing that a constitutional violation occurred and that a reasonable possibility of prejudice exists. See State v. Graham, 422 So.2d 123, 131 (La.1982), appeal dismissed, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983). See also LSA-C.E. art. 606 B; State v. Bibb, 626 So.2d 913, 925 (La.App. 5th Cir.1993). Thus, if there is a reasonable possibility that extraneous information considered by the jury affected its verdict, a new trial is mandated. State v. Sinegal, 393 So.2d 684, 687 (La.1981). On the other hand, normal jury pressures and intra-jury influences are not grounds for overturning a verdict. State v. Jacobs, 558 So.2d 1220, 1225 (La.App. 1st Cir.), writ denied, 564 So.2d 319 (La.1990).
The record reflects that defense counsel had subpoenas issued ordering the attendance of the jurors at a hearing on the motion for new trial, which was held on December 7, 1992. Nine of the members of the twelve-person jury, the alternate and two other nonjuror witnesses, Janice McGee and Anita Walgamotte, defendant's sisters, testified for the defense at this hearing.
Janice McGee related the circumstances of a single incident in which she saw several jurors talking after defendant's trial began. On the afternoon of the last day of the trial, she opened the door to the women's rest room on the second floor of the courthouse, apparently during a recess. At that time, there were three female jurors and another female who was not a juror, in the rest room. These four females were talking to the victim's mother who was also inside the rest room. McGee stated that she did not hear what was being said but, when she opened the door, the other females immediately stopped talking before they resumed talking. More specifically, McGee stated that she never heard them talking about defendant's trial.
Anita Walgamotte testified that, while she was inside one of the stall's in the women's rest room sometime after jury selection and prior to opening statements, she overheard a female telling someone that she was glad that the individual was at the trial "because that's going to give her some moral support and since this is the first time she's encounter[ed] such an experience, it will be good for her." When Walgamotte exited the stall, she saw the victim's mother and another woman, a nonjuror, in the rest room. This was the only contact between the two women observed by Walgamotte.
During recess of the trial which followed, Walgamotte observed this other woman with one of the female jurors. Walgamotte indicated *446 that she surmised that the other woman was either the juror's mother or a friend.
Immediately after defense counsel completed his presentation of the testimony of McGee and Walgamotte, the trial court indicated that the only evidence of any contact between other individuals and jurors related to contact between female jurors occurring in the women's rest room. Thus, the court questioned why defense counsel had subpoenaed the male jurors. Nevertheless, the court stated that, although it would allow defense counsel to call the male jurors as witnesses, it would not permit counsel to engage in a "fishing expedition." Defense counsel then introduced the testimony of five male jurors, Michael Norman, Joe Doucet, Wayne Johnson, John White and Bennett J. Rizzo and the alternate juror, Ms. Yolanda Scott, which in no way substantiated defendant's claim of extraneous prejudicial information improperly brought to the jury's attention.
Gina Farrington, a juror, testified that, prior to deliberations, no one talked to her about the case and she did not receive any information about the case outside the courtroom. She did not overhear anyone talking about the case or the evidence during any recess of the trial, and she did not hear any of the other jurors discussing any of the evidence with any witness or any other person, apparently with the exception of appropriate discussions between the jurors during deliberations. When asked whether or not the jurors had discussed the evidence prior to deliberations, Farrington indicated that, when the jury was given the evidentiary exhibits for their viewing, some of the jurors mumbled to each other to remember "this" or "that type of thing" in regard to the exhibits. However, Farrington made clear that the evidence was not "really discussed." In any event, Farrington testified that what was said between the jurors prior to deliberations did not affect her or her decision in any way and did not cause any undue influence upon her at the time. Farrington further testified that she did not hear or take part in any discussion in the rest room.
Evelyn Lewis, a juror, testified that no one talked to her about the case and she did not receive any information about the case in any other manner outside the courtroom prior to deliberations among the jurors. No one approached her or tried to discuss the evidence with her before she was allowed to go to the jury room to deliberate the verdict, nor did she hear any of the other jurors discuss the evidence with any juror prior to jury deliberations. Lewis stated that she did not recall overhearing anything in the rest room; and, more specifically, she was not present when the victim's mother may have had a conversation with any other juror or other person.
Lewis also acknowledged having been questioned during the trial concerning a conversation, during a trial recess, between her and a state witness, Detective Ronald Perkins. Lewis explained that she had heard someone ask Perkins about him having moved away from Houma. When Perkins exited the courtroom, she told him that she did not know that he had moved. Perkins answered that he had moved to California and was attending school. According to Lewis, the foregoing remarks constituted the entirety of what was said between her and Perkins. She further testified that she does not know Perkins "that well." Perkins did not talk to her about any of the evidence or what may have occurred at the parish jail.[4]
*447 Gwen Tivet, a juror, testified that she did not overhear anyone talking about the case or the evidence during any of the breaks. No one approached her or tried to discuss the evidence or the case with her before she was allowed to go to the jury room to deliberate. Neither she nor any other juror discussed the evidence with any other juror prior to deliberations.
Tivet indicated that during a trial recess she made one statement while she was in the rest room. The statement was: "I said that sleazy mother f[___]." According to Tivet, that was all she said and that she did not even mention anyone's name or anything else. Someone else was in the rest room at the time the statement was made. However, Tivet did not recall who that person was, but she stated that she did not think the person was a juror. Tivet testified that she did not make the statement with any intent of influencing anyone else and was not trying to be an advocate for either side.
Tivet related the circumstances of a contact she had with the victim. Tivet testified that she met the victim in the hallway of the courthouse. Tivet had never previously seen the victim. Tivet asked the victim if she was present to watch a trial. The victim replied only that she was there to testify and that she was a victim.
Furthermore, Tivet testified that there was no prejudicial information or outside information brought to her attention that entered into her final decision in the case. In reaching her verdict, she did not consider anything other than the testimony from witnesses and physical evidence.
Similarly, Valentina Williams, a juror and the final defense witness, testified that she did not take part in or overhear any conversation between jurors or jurors and third persons that may have occurred in the rest room of the courthouse. She did not discuss the case with anyone and specifically with any juror before the case was deliberated by the jurors. No outside influence or prejudicial information was brought to her attention before she deliberated. During her deliberations, she did not consider anything other than the facts, introduced into evidence or brought out in the courtroom from the witness stand, or physical evidence.
The record reflects that the hearing on the motion for new trial resumed on January 8, 1993. However, prior to recessing the December 7 hearing, the trial court referred to the three jurors, Mark Taylor, Stephen Pellegrin and Stephanie Morris who did not appear at the hearing. Consistent with its earlier comments regarding the evidence presented by defendant, which primarily related only to conversations and/or statements made in the women's rest room, and the propriety of questioning the male jurors, the trial court informed defense counsel that it would not permit defense counsel to subpoena Taylor and Pellegrin as witnesses at the resumed hearing.
When the hearing resumed, defense counsel stated that he had not contacted the two absent male jurors to see if they knew anything concerning any extraneous influence on the jury but that he would attempt to contact the two men to determine if either of them had such knowledge. Defense counsel indicated that, if he determined that either of these jurors had such knowledge, he would bring the pertinent information to the court's attention and attempt to secure affidavits from the two jurors. Defense counsel stated that he had obtained an affidavit from Stephanie Morris who indicated that she had no information concerning any extraneous influence on the jury. The affidavit, which was then marked and filed in evidence, does in fact reflect that Morris was not exposed to any extraneous influence during the trial.
Finally, defense counsel filed in evidence an affidavit obtained from Officer David Perio, a correctional officer with the Terrebonne Parish Sheriff's Office, who indicated that he was present at approximately 5:00 or 6:00 a.m. on June 10, 1992, when defendant was being booked in the Terrebonne Parish Jail. According to Perio, at about that time, he observed two "hickey" or passion marks, one on each side of the lower part of defendant's neck.
*448 The record shows that the introduction of these two affidavits concluded defendant's presentation of evidence on the motion for new trial. At that point, the trial court denied the motion with oral reasons. In stating its reasons, the trial court essentially concluded that defendant had failed to show that there had been any outside communication between any nonjurors and jurors that might have tainted the jury deliberation process.
We agree with the trial court's conclusion that there was no showing of prejudicial jury misconduct in this case. Janice McGee testified concerning a single incident occurring during a trial recess in the women's rest room at the courthouse when three jurors and a third party were talking to the victim's mother. However, McGee stated that she did not hear what was said; and, more particularly, she did not hear these individuals talking about defendant's trial. Anita Walgamotte related a contact between the victim's mother and a nonjuror, whom Walgamotte surmised was a relative or friend of one of the jurors. Gina Farrington's testimony related only to some apparently brief remarks made between jurors when the jury was given evidentiary exhibits to view during the trial. However, Farrington's testimony further showed that she had not been exposed to any extraneous influence. Evelyn Lewis' contact with Ronald Perkins was shown to be clearly innocuous, relating only to the fact that Perkins had moved to California. Cf. State v. Guidry, 496 So.2d 650, 653-654 (La.App. 1st Cir.1986), writ denied, 500 So.2d 420 (La.1987). Gwen Tivet's statement which she made in the women's rest room did not refer to anyone by name. Although Tivet testified that someone was present in the rest room when she made the statement, she did not believe the other person was a juror; and there was no evidence presented at the hearing on the motion for new trial that the other person was a juror.
Furthermore, although defendant does not clearly argue that the information in Officer David Perio's affidavit, pertaining to the existence of "hickey" or passion marks on defendant's neck, entitled him to a new trial on the basis that this information was newly discovered evidence, he appears to make an assertion in brief that this information entitled him to a new trial. In that regard, defendant asserts that this evidence served to negate the victim's lack of consent to sexual intercourse with him. In any event, we find no abuse of discretion by the trial court in denying the motion for new trial on the basis of this alleged newly discovered evidence. In our view, defendant's claim is based on information which, with reasonable diligence, could have been discovered before or during the trial. See State v. Clark, 558 So.2d 665, 669 (La.App. 1st Cir.), writ denied, 564 So.2d 317 (La.1990). Moreover, this claimed newly discovered evidence was cumulative as to an issue fairly disclosed and decided at trial[5] and is not of such import that, if introduced at the trial, it would have been of material significance with regard to changing the finding of guilt. See State v. Lavene, 343 So.2d 185, 188 (La.1977).
Accordingly, this assignment lacks merit.

PATENT SENTENCING ERROR
We have discovered a patent sentencing error. Neither the minutes nor the sentencing *449 transcript show that the trial court, in imposing this sentence, gave the defendant credit for time spent in actual custody prior to sentencing. Such an allowance of credit is mandatory. LSA-C.Cr.P. art. 880. Patent sentencing error occurs when the trial court fails to specify credit for time served. State v. Greer, 572 So.2d 1166, 1172 (La.App. 1st Cir.1990). Accordingly, we find patent sentencing error and amend the sentence to reflect that the defendant is to be given credit for time served prior to the execution of his sentence. See LSA-C.Cr.P. art. 882 A. Resentencing is not required; however, we remand this case and order the district court to amend the commitment and minute entry of the sentence to reflect that the defendant is given credit for time served. See State v. King, 604 So.2d 661, 670 (La.App. 1st Cir. 1992).
CONVICTION AFFIRMED. SENTENCE AFFIRMED AS AMENDED, AND REMANDED WITH ORDER.
NOTES
[1] In brief, under the headings "EIGHTH ERROR OF ASSIGNMENT," "NINTH ERROR OF ASSIGNMENT," AND "TENTH ERROR OF ASSIGNMENT," defendant asserts that these "assignments" have been briefed; but, under those headings, he essentially only restates the wording of his formally designated assignments one and two. Restatement of an assignment of error in brief is nothing more than a listing of the assignment and certainly does not constitute briefing of the assignment. Defendant advances no actual argument and cites no authorities in support of either of these assignments. Even assuming that defendant's assertion that the assignments have been briefed is an attempt by him to rely on and adopt by reference the substance of any briefs he may have submitted to the trial court, any such attempted reliance on or adoption of briefs by reference is of no effect and, thus, does not constitute briefing at the appellate court level. Therefore, assignments of error numbers one and two are deemed abandoned. See State v. Schaub, 563 So.2d 974, 974-75 n. 2 (La.App. 1st Cir. 1990): State v. Frelix, 484 So.2d 936, 938 (La. App. 1st Cir.1986).
[2] In brief, defendant additionally generally asserts that the trial court erred by denying his motion in arrest of judgment. However, because neither assignment of error number five nor any of defendant's other six assignments of error assert that the trial court erred by denying the motion in arrest of judgment, defendant's assertion constitutes an argument not formally assigned as error and, thus, one not properly before this Court on appeal. See State v. Spell, 399 So.2d 551, 557 (La.1981).
[3] Herein, the only such allegation presented to the trial court is the allegation quoted above from defendant's motion for new trial.
[4] The record reflects that Lewis was questioned at trial about her contact with Perkins. Immediately prior to this questioning, which occurred during a trial recess outside the presence of the other jurors, the trial court told Lewis that the court had received a report that she and Perkins had some type of contact during a prior recess. The questioning was conducted by the trial court and the prosecutor. When the prosecutor finished his questioning of Lewis, defense counsel declined to ask Lewis any questions.

The testimony given by Lewis at the hearing on the motion for new trial was entirely consistent with that given by her when she was questioned at trial about the contact. In addition, when questioned at trial, Lewis stated that she recalled being asked during voir dire if she knew any of the persons who were to be witnesses at the trial but that she did not remember Perkins' name having been read from the witness list. Lewis indicated that she did not "really know" Perkins. She knew only his last name and did not know him personally. Furthermore, she indicated that the limited extent to which she knew him would not interfere with or hamper her ability to listen to the evidence and render a fair and impartial verdict in the case.
[5] At trial, Madeline Galliano, defendant's mother, and Janice McGee, defendant's sister, each testified that they saw defendant on the day before his arrest at which time he did not have any "hickey" or passion marks on him, and at the parish jail on the day of his arrest. When they saw defendant at the jail, he had two "hickey" or passion marks on his neck. However, both witnesses stated that they did not have any knowledge of the origin of the marks. Additionally, during his testimony, defendant stated that while he and the victim were having consensual sex the victim kissed him on the neck and left a passion mark on each side of his neck.

In rebuttal, the state presented the testimony of Officers Greg Hood, who went to the crime scene on the morning of the offense as a back up officer) and Detective Ronald Perkins. Hood stated that he did not remember seeing two "hickey" or passion marks on defendant's neck and he did not recall defendant pointing out any such marks to him. Similarly, Perkins did not recall seeing any such marks on defendant on the morning of defendant's arrest or later that same day when defendant made the videotaped statement in his presence. Also, Perkins did not remember defendant ever telling him that the victim had left "hickey" or passion marks on his neck.