696 So.2d 1043 (1997)
STATE of Louisiana,
v.
Lynn P. GALLIANO.
No. 96 KA 1736.
Court of Appeal of Louisiana, First Circuit.
June 20, 1997.
*1045 Margaret S. Sollars, Thibodaux, for Appellant Lynn P. Galliano.
Jason P. Lyons, Houma, for Appellee State.
Before WHIPPLE and FITZSIMMONS, JJ., and TYSON, J. Pro Tem.[1]
RALPH TYSON, Judge Pro Tem.
Defendant, Lynn Paul Galliano, was charged by grand jury indictment with aggravated rape, a violation of LSA-R.S. 14:42. *1046 Defendant pled not guilty and, after trial by jury, was found guilty as charged. The trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, we initially affirmed defendant's conviction, amended his sentence to reflect that he was to be given credit for time served prior to execution of sentence and remanded the case to the district court with an order to the district court to amend the commitment and minute entry of sentencing to reflect that defendant was to be credited with time served. See State v. Galliano, 93-1101 (La. App. 1st Cir. 6/24/94); 639 So.2d 440.
Defendant applied to the Louisiana Supreme Court for supervisory writs. The Supreme Court granted the applications in part by remanding the case to this Court for consideration of six arguments not formally assigned as errors, which we had declined to address. Defendant's writ applications were denied in all other respects. See State v. Galliano, 94-2030 & 94-2280 (La.1/6/95); 648 So.2d 911. On remand, we found merit to one of those arguments, reversed defendant's conviction and sentence and remanded the case for a new trial. See State v. Galliano, 93-1101 (La.App. 1st Cir. 5/5/95); 655 So.2d 538.
Thereafter, at a second jury trial, defendant was found guilty of the lesser included responsive offense of forcible rape, a violation of LSA-R.S. 14:42.1. The trial court sentenced defendant to imprisonment at hard labor for a term of thirty-five years without benefit of parole, probation or suspension of sentence and with credit for time served. Defendant now appeals, urging six assignments of error.

FACTS
The record reflects that the instant offense occurred between approximately 11:30 p.m. on June 9, 1992, and 1:30 a.m. on June 10, 1992, inside defendant's home at 200 Ongeron Street. After the offense, the victim, a thirty-nine year old woman, exited defendant's home and walked a couple of houses down the street to wait for a taxicab defendant called at her request. Soon after the victim left the residence and before the taxicab arrived, Tammy Baudoin drove up and talked to the victim on the street. Henry Aycock, the taxicab driver, was dispatched to defendant's address sometime between 1:30 and 2:00 a.m. on June 10. Within three or four minutes after receiving the dispatch, Aycock drove up and was approached by the two women. The victim told Aycock she had been raped and asked him to summon the police. Aycock had his dispatcher call the police. The police came to the location within a few minutes after Aycock's arrival.[2]
The victim informed the police that defendant raped her and used a handgun and a shotgun to accomplish the crime and pointed out defendant's house to the police. Several officers came to the crime scene in response to the report of the rape. After the police knocked on the door of defendant's home and telephoned the residence without anyone answering the knocks or the telephone, they continued to knock on the door, windows and walls of the residence. Finally, defendant came out. Defendant was advised of his constitutional rights and the rape complaint. Defendant made oral statements to the police that he had not raped anyone but had had consensual sex that night with a woman.
After defendant gave his consent to the police to search his residence, he entered his home with the police who undertook the search. During the search, the police seized the bedclothes and pillows from a bed, and a pair of underpants and pantyhose belonging to the victim. Also seized were a.410 shotgun and a .38 handgun and holster for the .38 belonging to defendant. After defendant was handcuffed and taken into custody by the police, he was transported to the police station. After defendant was again advised of his constitutional rights and after defendant executed a consent to questioning form, he gave the police a videotaped statement consistent with his earlier oral statements.

ASSIGNMENT OF ERROR NUMBER ONE
In this assignment, defendant contends that the trial court erred in overruling his *1047 objection, under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), based solely on the prosecutor's use of a peremptory challenge to exclude prospective juror Cynthia Bradley from serving on the jury. In asserting his Batson claim to the trial court, defendant merely objected to the striking of Bradley and offered no other facts to meet his burden of establishing a prima facie case of purposeful discrimination by the state under the first step of the Batson analysis.
In Batson, the Supreme Court adopted a three-step analysis to determine whether or not the constitutional rights of a defendant or prospective jurors have been infringed by impermissible discriminatory practices:
First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race[3]. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) [citations omitted; endnote ours].
"The second step of this process does not demand an explanation that is persuasive, or even plausible." Purkett v. Elem, 514 U.S. 765,____, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Because a trial judge's findings pertaining to purposeful discrimination turn largely on credibility evaluations, such findings ordinarily should be entitled to great deference by a reviewing court. Batson v. Kentucky, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. Reasons offered to explain the exercise of peremptory challenges should be deemed race neutral unless a discriminatory intent was inherent in those reasons. See Hernandez v. New York, 500 U.S. at 360, 111 S.Ct. at 1866.
Bradley was a member of the first panel of twenty prospective jurors from which the first six members of the twelve-person jury were selected. The remaining six members of the jury and an alternate were chosen from the second panel of seventeen prospective jurors. However, there is no record evidence that any of the prospective jurors were even questioned as to their race. The only indication of the race of any of the prospective jurors or the actual jurors selected is a statement by the prosecutor, after defense counsel made the Batson objection, that Bradley was African American and that Audrey Thomas, who was selected and seated to serve on the jury from the first panel, was African American. Consequently, other than this statement by the prosecutor relating to the race of Bradley and Thomas, the record does not indicate the racial composition of the actual jurors or the alternate juror (who was dismissed immediately prior to jury deliberations).
Without the trial court ever ruling as to whether or not defendant had established a prima facie case under Batson, the prosecutor responded to the Batson objection to the state's peremptory exclusion of Bradley, as follows:
Mr. Lyons:
First of all, Judge, I don't think there's been a showing of any systematic exclusion of blacks from this jury. Ms. Bradley for the record, is an African American and I'd also like the record to reflect that juror No. 1, Audrey Thomas, is also an African American. If you want some racially neutral reasons, No. 1, she [Cynthia Bradley] only has a seventh grade education and No. 2, I'm not sure where I've seen her, but she's related to someone that I've prosecuted. I realize it didn't come out from the record. But I know it for a fact, and I think that's more than sufficient to get above a Batson challenge. Addition, additionally, she was very inattentive. She wasn't paying attention when I questioned her. I couldn't establish eye contact. I *1048 just feel that she wouldn't be a good juror for the State for those reasons.
Immediately thereafter, in overruling the Batson objection, the trial court noted that defendant was Caucasian. Defense counsel objected to the ruling.
We conclude that defendant clearly failed to meet his burden of production under step one. Nevertheless, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez v. New York, 500 U.S. at 359, 111 S.Ct. at 1866.
The reasons given by the state for exercising the peremptory challenge of Bradley are facially "race-neutral." They contain none of the cultural, geographic, or linguistic classifications which, due to the ease with which such classifications may serve as a proxy for an impermissible classification, invite particularly exacting scrutiny. Cf. Hernandez v. New York, 500 U.S. at 363, 111 S.Ct. at 1868 (wherein a prosecutor's striking of Spanishspeaking jurors "raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges"). Hence, we conclude that none of the reasons articulated by the state are readily associated with the suspect class which is alleged to be the object of the state's discriminatory use of peremptory strikes, i.e., prospective African American jurors.
For these reasons, we find that the state sustained its burden of articulating "race-neutral" reasons for the exercise of the peremptory strike at issue. Whether these reasons are substantial and, more importantly, whether they are substantiated by the record, is a question to be determined in the third stage of the Batson analysis. See State v. Green, 94-0887, p. 27 (La.5/22/95); 655 So.2d 272, 289. Reviewing courts owe the trial judge proper deference in assessing the credibility of in-court testimony. Thus, the proper inquiry in this final stage of the Batson analysis is not whether the state has disproved the existence of purposeful discrimination suggested by a defendant's prima facie case; rather, the question is whether a defendant's proof, when weighed against the prosecutor's offered "race-neutral" reasons, is strong enough to persuade the trierof-fact that such discriminatory intent is present. Any other approach would violate the principle that the ultimate burden of proving racially motivated strikes in violation of Batson rests with the opponent of the strike. See State v. Green, 94-0887 at p. 29, 655 So.2d at 290.
While defendant correctly observes that Carroll White, who served on the jury, had a seventh grade education as did Bradley, the fact that White was accepted by the state and Bradley was excused by the state does not in itself show that the explanation for excusing Bradley was a mere pretext for discrimination. The accepted juror may have exhibited traits which the prosecutor reasonably could have believed would have made the individual desirable as a juror. See State v. Collier, 553 So.2d 815, 822 (La.1989). Nor does the fact that the record does not substantiate the prosecutor's claim that Bradley was related to someone he had prosecuted show that the prosecutor's assertion of such a relationship was a pretext for discrimination. Finally, the remaining reasons given by the prosecutor, i.e., that Bradley was very inattentive and that she could not make eye contact with him, clearly constitute race-neutral reasons. See State v. Durham, 94-1036, p. 16 (La.App. 5th Cir. 4/16/96); 673 So.2d 1103, 1113. (recognizing a venireman's failure to make eye contact with the prosecutor as a racially neutral reason); State v. Willis, 552 So.2d 39, 42 (La.App. 3d Cir. 1989), writ denied, 560 So.2d 20 (La.1990) (recognizing a venireman's inattentiveness as a racially neutral reason).
After carefully reviewing the entire record of voir dire, we find no abuse of discretion or error by the trial court in its determination that there was no purposeful discrimination based on race by the state against African American individuals. Nor do we find anything in this record to otherwise show that the state employed a tactic of purposeful *1049 racial discrimination in its exercise of peremptory challenges in this case.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
By means of this assignment, defendant contends that the trial court erred by not allowing him to "disprove the credibility of the State's evidence and the victim by questioning her about episodes of drug and alcohol abuse." Essentially, defendant appears to assert that he was denied his constitutional right to confrontation because he was not allowed to cross-examine the victim in order to show the extent of her substance abuse of alcohol and possibly drugs and the possible effect the alleged abuse had on her physically and mentally at the time of the incident. Defendant asserts that evidence of the victim's alleged prolonged and habitual abuse of alcohol and possibly drugs was critical to his defense that he and the victim had consensual sex.
During the victim's direct examination, she testified as to her consumption of beer during the hours of June 9-10 preceding the instant offense, including testimony that from "after lunch" until 10:00 to 11:00 p.m. on June 9, she had about eight to ten beers, that she did not have anything to drink at defendant's home, and that, while at Jerry's II Lounge with defendant prior to going with him to his residence, she was able to stand up, walk and understand what was happening and did not feel like she was drunk. Thereafter, on cross-examination, the victim further stated that, although she was not sure, she was probably legally intoxicated while she was at defendant's home. The victim further stated that she definitely was impaired to drive a vehicle and would not have driven one.
On continued cross-examination, the victim testified that she had three convictions for driving while intoxicated; but she specifically denied she had been treated for alcohol abuse. However, she admitted she had been committed by the Terrebonne Parish Coroner to a mental facility on two occasions. The victim stated that, after her father died, she was there for depression.
Immediately thereafter, defense counsel continued cross-examining the victim during the following exchange:
Q. Weren't you also there [in the mental facility] for drug addiction and excessive alcohol abuse?
A. I've never been on drugs.
Q. So if the medical reports would indicate that you were suffering from an addiction to ...
MR. LYONS:
Judge, let me object to this No. 1 as being hearsay and No. 2 as being improper evidence to impeach someone or attack their credibility.
THE COURT:
Ms. Malbrough?
MS. MALBROUGH:
I think drug addiction can certainly attack someone's credibility, especially if she's not telling the truth about it.
MR. LYONS:
I think she can ask her if she's on drugs right now. I don't think she can ask her if she's ever used drugs in her life just like I couldn't ask her client if he chooses to testify.
MS. MALBROUGH:
I think I can ask her if she's been treated for drug abuse.
THE COURT:
Sustain the objection. Rephrase your question.
BY MS. MALBROUGH:
Q. [Victim], weren't you in fact committed to Mandeville because you attempted suicide by taking an overdose of drugs.
A. Is that the drugs you're talking about?
Q. Would you answer my question, please?
A. That's right.
Q. How many times have you been convicted of simple battery?
A. I don't know.
Q. Do you recall pleading guilty to the charge of simple battery on March 17, 1975?
A. Huh-huh.

*1050 Q. Do you recall pleading guilty to the charge of disturbing the peace on January 14, 1977?
A. Right.
Q. Do you recall pleading guilty to simple battery on October 27, 1982?
A. Yeah.
Q. Do you recall pleading guilty to simple battery, simple assault, another count of simple battery, simple criminal damage to property and resisting an officer on March 28, 1984? [Victim], were any of these incidents alcohol related?
A. What do you mean by alcohol related?
Q. Were you under the influence of alcohol when you committed any of these batteries?
MR. LYONS:
I'm going to object to the relevancy of that, Judge.
THE COURT:
Objection sustained.
BY MS. MALBROUGH:
Q. Do you recall on December 14, 1976, pleading to a misdemeanor, pleading not guilty by reason of insanity?
BY LYONS:
Judge, I'm going to object to that. This is a completely improper character attack on this woman. Ms. Malbrough knows that's an improper question.
THE COURT:
Objection sustained.
MS. MALBROUGH
I'm sorry. What did you say, Judge? The court:
Objection sustained.
MS. MALBROUGH:
Okay. I'll move on[4]. [endnote ours.]
Based upon the record before us, we find no abuse of discretion by the trial court in sustaining the prosecutor's objections to the defense questioning in the above quoted exchange. Various ways are recognized as proper to attack the credibility of a witness who has testified to facts occurring at the time of the offense. Thus, defects of capacity, sensory or mental, which lessen the ability to perceive the facts which the witness purports to have observed, are provable to attack the credibility of the witness, either upon cross-examination or by producing other witnesses to prove the fact. See LSA-C.E. art. 607(C) and (D)(1); State v. Luckett, 327 So.2d 365, 372 (La.1975) (on rehearing). Clearly, a defect in capacity may result from the use of drugs or alcohol. If a witness was intoxicated, by use of drugs or alcohol, on the occasion respecting which he is called upon to testify, that fact goes to his credibility and the weight of his testimony. See State v. Luckett, 327 So.2d at 372; State v. Harrison, 501 So.2d 1041, 1044 (La.App. 2d Cir.), writs denied, 508 So.2d 65 and 515 So.2d 444 (La.1987). See also State v. King, 604 So.2d 661, 669 (La.App. 1st Cir. 1992). Compare Jarrett v. United States, 822 F.2d 1438, 1446 (7th Cir.1987); United States v. Cameron, 814 F.2d 403, 405 (7th Cir.1987). On the other hand, evidence of habitual intemperance should not be admissible because, in most cases, it bears little relevance to the credibility of the witness and falls within the proscription against impeachment of the general credibility of the witness through particular acts and vices. See LSA-C.E. art. 608; State v. Landry, 359 So.2d 99, 102 (La.1978). Herein, the defense clearly was not improperly restricted in its efforts to explore the subject of the victim's use of drugs or alcohol. Consequently, there was no denial of defendant's Sixth Amendment right to confrontation as alleged by defendant.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
In this assignment, defendant contends that the trial court erred by failing to grant his motion to suppress physical evidence and statements "gathered from illegal police procedures." Defendant also contends that the trial court erred by allowing the state to introduce the transcript of his trial testimony from his first trial, which he asserts was a *1051 "poisonous fruit" of the alleged illegal police procedures. Defendant asserts that his submission to police authority, when the police surrounded his home and ordered him to come out with his hands in plain sight, effectuated an illegal arrest of him based on suspicion rather than probable cause and without an arrest warrant and exigent circumstances in violation of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Defendant argues that, as a result of his illegal arrest, the physical evidence seized during the search of his home and his statements to the police and testimony from his first trial were tainted and should have been suppressed. Defendant asserts that the state failed to prove his consent to search his residence was not the result of his illegal arrest and that the consent was freely given without any threats and/or promises of leniency. As an additional ground for suppressing his videotaped statement, defendant asserts that he was induced to give the statement by a promise from Officer Perkins that giving the statement would "make it a lot easier [for defendant]." Defendant submits that his videotaped statement and consent to search are inextricably linked to his illegal arrest and that there were no intervening circumstances to validate either the statement or the consent to search. Finally, concerning the transcript of his testimony at the first trial, defendant submits that the transcript of this testimony was inadmissible, because the testimony was given at the first trial as a result of his need to dispel the illegally obtained physical evidence and statements given to the police.
In Payton v. New York, the United States Supreme Court held that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest. 445 U.S. at 576,100 S.Ct. at 1374-1375. However, police entry into a residence is a justifiable intrusion of the protected area of a residence if there is probable cause to arrest and exigent circumstances. State v. Hathaway, 411 So.2d 1074, 1079 (La.1982). Examples of exigent circumstances are: lack of sufficient time to prepare an affidavit, locate a magistrate and obtain a warrant after probable cause arises; the possibility of a defendant's escape; the avoidance of a possible violent confrontation that could cause injury to the officers and the public; and the removal or destruction of evidence. See State v. Welch, 449 So.2d 468, 470 (La.1984); State v. Hathaway, 411 So.2d at 1079.
Concerning a defendant's statements to the police outside the home following a Payton violation, the Supreme Court held in New York v. Harris, 495 U.S. 14, 21, 110 S.Ct. 1640, 1644, 109 L.Ed.2d 13 (1990), that, where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the state's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton.
A search conducted without a warrant is per se unreasonable under the Fourth Amendment to the United States Constitution, subject only to a few specifically established and well-delineated exceptions. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). One of these is a search conducted pursuant to consent. When the state seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving the consent was given freely and voluntarily. State v. Pautard, 485 So.2d 909, 912 (La.1986). Because consent is a question of fact involving credibility of the witnesses, the determination of the trial judge, who had an opportunity to observe and hear the witnesses, is given great weight on review. State v. Murley, 514 So.2d 1189, 1191 (La.App. 1st Cir.1987), writ denied, 520 So.2d 424 (La.1988).
An arrest is defined in LSA-C.Cr.P. art. 201 as follows:
Arrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him.
An arrest occurs when circumstances indicate an intent to effect an extended restraint *1052 on the liberty of an accused, rather than at the precise time an officer tells an accused he is under arrest. State v. Commodore, 418 So.2d 1330, 1333 (La.1982); State v. Wichers, 392 So.2d 419, 423 (La.1980).
A peace officer may lawfully arrest a person without a warrant when he has reasonable cause to believe that the person to be arrested has committed an offense. LSA-C.Cr.P. art. 213(A)(3). Probable cause to arrest exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. Although mere suspicion cannot justify an arrest, the officer does not need sufficient proof to convict. State v. Bell, 395 So.2d 805, 807 (La.1981). Probable cause must be judged by the probabilities and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act. Whether probable cause existed at the time of the arrest must be determined without regard to the result of the subsequent search. State v. Buckley, 426 So.2d 103, 107 (La.1983).
It is well settled that for a confession or inculpatory statement to be admissible into evidence, the state must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menaces, threats, inducements or promises. LSA-R.S. 15:451; State v. Williams, 521 So.2d 629, 630 (La.App. 1st Cir.1988). Additionally, the state must show that an accused who makes a statement or confession during custodial interrogation was first advised of his Miranda rights. State v. King, 563 So.2d 449, 453 (La.App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990).
At the October 15, 1992, hearing on defendant's motion to suppress, the state presented the testimony of Officers Freddie Williams and Dwayne John Farmer of the Houma City Police Department; and defendant presented his own testimony in support of his motion. Roland Perkins, who was employed as an officer with the Houma City Police Department at the time of the instant offense and was the lead detective in the criminal investigation, did not testify at the suppression hearing but did testify at trial.[5]
Officer Farmer, the first officer at the scene, testified that he got there on June 10 at 2:27 a.m. At that time, the taxicab driver told him the victim had asked him to call the police because she had been raped. Farmer spoke to the victim and was informed by her that Lynn Galliano had raped her. In response to Farmer's request, the victim pointed out defendant's home to Farmer. Police detectives were sent to the scene.
Farmer testified that, when the detectives arrived, the police surrounded defendant's home. He estimated there were about seven armed officers, including himself, at the location. The officers knew guns were involved in the rape from having been so informed by the victim. About fifteen minutes after the officers first attempted to get someone to come out by knocking, defendant exited. Farmer stated that he did not believe he had his weapon drawn and that he did not remember any of the other officers with their weapons drawn and pointed at defendant. According to Farmer, although he did not recall the exact words that were used, defendant was told to exit and keep his hands in plain view. Farmer testified that defendant was searched and that he believed that defendant was handcuffed at that point. Defendant was read his constitutional rights. Farmer stated that he did not see any force, threats or intimidation used against defendant and that he was not aware of any of the officers making any promises to defendant. Although defendant gave the officers permission *1053 to search his home, Farmer was not present when defendant signed the consent to search form. However, after the consent to search was given, Farmer did enter defendant's home, at which time defendant told the officers where the weapons were.
At the suppression hearing, Williams testified that he arrived at the scene on June 10 at about 3:00 a.m. After first speaking to Perkins, Williams spoke to the victim, who was about two houses down from defendant's home. The victim told Williams defendant had raped her at his residence at gunpoint. Williams indicated he was sure there were five police units at the scene and possibly others there too. Although Williams did not see any of the officers with their weapons drawn, he stated that some of the officers might have had their weapons in a "ready position" and that it was highly possible some of the officers could have had their weapons drawn. After the officers telephoned defendant's residence and received no answer, they knocked at the residence. Within about fifteen minutes, defendant came out the side door to his home.
When defendant exited the house, Williams advised defendant of his rights and that a rape complaint had been made against him. Defendant indicated he understood his rights. Thereafter, defendant admitted he had sex with a woman but denied raping her and indicated the sex was consensual. Williams testified that neither he nor any of the other officers in his presence threatened, struck or intimidated defendant or made any promises for defendant's oral statement. According to Williams, defendant appeared to be in possession of all of his faculties and did not appear to be intoxicated or under the influence of drugs.
Thereafter, Perkins asked defendant for his consent to search defendant's residence. Perkins read a consent to search form to defendant, which defendant signed. Williams did not recall defendant having initially refused to sign the form. Williams stated that he did not, and that he did not witness any other officer, threaten defendant, make any promises to defendant or use any type of coercion in obtaining the consent to search. After defendant signed the consent to search form, defendant led the police inside his home and pointed out the locations of a .38 handgun and a .410 shotgun.
Williams testified that he transported defendant from defendant's residence to the police station. The two did not talk to each other enroute to the station. At the station, Perkins read defendant his rights; and defendant signed an advice of rights form. Williams signed the form as a witness. In regard to the form, Williams did not threaten defendant in any way or make defendant any promises for a statement. Additionally, Williams stated that he did not tell defendant he would be "easy on him" or that "things would go better" for him or that he would recommend any type of sentencing or talk to the district attorney on defendant's behalf. Williams further stated that nothing was said to defendant in Williams' presence that might indicate it would be in defendant's interest to make a statement. After defendant executed the form, Williams left the station to go to the hospital to check on the victim and was not present at the time defendant gave his videotaped statement at the station.
Perkins testified at trial that, when he arrived at the scene, he first spoke to the victim. The police telephoned defendant's residence but no one answered the phone. The police also knocked on the doors, windows and walls of defendant's home for about ten to fifteen minutes without getting any answer. Perkins left and went back to where the victim was and spoke to her again. While talking to the victim, she told Perkins a handgun and a shotgun had been used during the rape. In the meantime, Williams informed Perkins that defendant had exited the home. Perkins went back to defendant's residence and advised defendant of what the victim had alleged. Williams advised defendant of his constitutional rights. Defendant told Perkins that he and the victim had gone out on a date to drink; he denied raping her, claiming that they had consensual sex. Perkins asked defendant if the police could go inside the residence and defendant agreed to allow them to do so. Defendant also gave Perkins a written consent to search.
*1054 Before Perkins took defendant's videotaped statement at the police station, defendant had been advised of his rights at his residence and also by Perkins at the station. Perkins stated that he made no promises or threats in connection with this statement and that it was voluntarily made by defendant.
At the beginning of the June 10, 1992, videotaped statement, State Exhibit S-6, defendant was given his rights. On the tape, defendant acknowledged he had been advised of his rights, understood his rights and indicated his willingness to talk to the police and that no promises had been made by the officers.
At the suppression hearing, defendant testified that, after the victim left his residence, he went to sleep. Within about an hour thereafter, defendant was awakened by flashlights and the sound of dogs barking. When defendant figured out it was the police, he yelled, "[h]ey, yo," to let them know he knew they were there; but the police acted like they did not hear him. Defendant then went to the side door and said: "Hey, I'm right here." When defendant opened the door, all of the officers had their guns drawn. They told defendant: "Freeze mother fucker, we're going to blow your shit away. We'll carry you in pieces." There were about five to seven officers there. Defendant put his hands up, and the officers told him to come outside. Defendant jumped down to the ground from the side door of his home, which had no steps. Defendant was told to come to the front of his home and was taken there. The police started interviewing him. When the officers told him the victim had said that he forced her to have sex with him, he denied the allegation but admitted he and the victim had sex. When the police asked defendant if they could look at his guns, he told them he had no objection to them looking at the guns.
In his suppression hearing testimony, defendant described his conversation with the police as "kind of friendly" but stated that he was aggravated by the police, because he had stated to them that there was "no problem" in connection with the sex he and the victim had. Defendant stated that, when he proceeded to open the door to his home to show the police the guns, they made a "big issue about something about if you don't want to show it to us you don't have to." Defendant admitted he signed a paper and put an "x" on the paper. According to defendant, he put the "x" on the paper because "[t]hat was like to me it was my way of giving consent for them to ... I figured that was consent enough for them to go ahead and see what they wanted to see." Defendant stated that he signed a consent to search, after being promised nothing would be taken from his house. About three to five years before June 10, 1992, the police had searched his home. The officers told him that, if they had to get a search warrant, they were going to tear his house apart worse than they had during the prior search. The officers also promised defendant that if he assisted them he would have no problems and that it would "be easier on [him]."
Defendant stated that he opened the front door for the police. After the police made the search and seizures, they told him he was definitely under arrest; and it was at that point that Williams advised him of his rights. Defendant told Williams he understood the rights. According to defendant, the statements he made prior to the search were made without any advice of his rights.
Later, at the police station, the police indicated to defendant that if he gave a statement they would be "a lot easier on me," and that they "almost promised me that I'd be going home.... I shouldn't have any problems."
In issuing its ruling denying the motion to suppress, the trial court found there was probable cause for defendant's arrest and no forced entry into defendant's home. The court stated that the crime involved, i.e., aggravated rape, perhaps would have been justification for the police to make a forced entry into the home without an arrest warrant, considering the seriousness of the offense and the possibility of destruction or removal of evidence. The court stated that it believed the statements at the residence and the videotaped statement were made after defendant was properly advised of his Miranda rights and that the statements were willingly and freely made by defendant. The court found the search was consensual and *1055 concluded that the arrest, statements and search and seizures were lawful.
We find no error in the trial court's ruling that defendant's arrest was lawfully made with probable cause, that defendant validly consented to the search of his home and that the oral and videotaped statements were given freely and voluntarily after proper advice of Miranda rights, which we find to be supported by the evidence. In making its ruling, the court obviously credited the testimony given by the officers and rejected defendant's testimony. These credibility determinations were within the sound discretion of the trial court and are entitled to great weight on appeal. See State v. Vessell, 450 So.2d 938, 943 (La.1984).
In our view, it makes no difference whether defendant's arrest occurred inside defendant's home after his consent to search and the officers' consensual entry of the house to effect the search or whether the arrest occurred outside the home. Under both scenarios, the arrest was lawful under Payton as there was probable cause to arrest without a warrant, based on the information the victim provided to the police, identifying defendant as the person who raped her and pointing out his residence. Even if we were to assume without conceding that the officers had made a forced entry of defendant's home to arrest him, the arrest was lawful, because the officers had probable cause to arrest and exigent circumstances to justify entering the home to effect an arrest. This was particularly so considering the seriousness of crime, i.e., aggravated rape, which was accomplished with the use of firearms and was committed a very short time prior to the arrest, and further considering the possibility of defendant's escape, and the possible removal or destruction of evidence. Cf. State v. Welch, 449 So.2d 468 (La.1984). The search was lawful as it was consensual. Consequently, the seizures made during the search were also lawful. The oral and videotaped statements were freely and voluntarily made after advice and waiver of Miranda rights. Accordingly, the statements and the physical evidence seized during the search were properly admitted into evidence at the trial. Additionally, the introduction of the transcript of defendant's testimony from his first trial was proper and did not violate his constitutional right to remain silent. See State v. Parker, 436 So.2d 495, 498-499 (La. 1983); State v. Reed, 324 So.2d 373, 379-380 (La.1975).
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
By means of this assignment, defendant contends that the trial court erred by denying his motion for new trial. His only argument in support thereof consists of his adoption of the same arguments made in his other briefed assignments alleging trial court errors. The defendant concludes that, when the errors alleged in his other briefed assignments are "added together," he is entitled to a new trial.
For reasons previously stated and reasons to follow, we find these other assignments to be meritless. We further find that this assignment is likewise without merit regardless of whether or not the errors alleged in the other assignments are considered together. See State v. Walker, 94-0587, p. 4 (La.App. 1st Cir. 4/7/95); 654 So.2d 451, 453, writs denied, 95-1124 & 95-1125 (La.9/22/95); 660 So.2d 470.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FIVE
In this assignment, defendant contends that, based on all the evidence presented at trial, the evidence was insufficient to support his forcible rape conviction.
In reviewing claims challenging the sufficiency of the evidence, this Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
*1056 The victim testified that, on June 9,1992, she rode with Tammy Baudoin and Sandy, Baudoin's boyfriend, to the apartment on Wood Street from which Tammy and Sandy were moving to an apartment next door to the victim's residence. While at the Wood Street apartment, the victim talked to defendant, a person she had never previously met. The victim wanted to go back home, and defendant offered and gave her a ride there. The victim and defendant waited for Tammy and Sandy at the victim's residence. After Tammy and Sandy arrived, defendant helped them unload various items they were moving and then returned to the victim's apartment. All four of them had been drinking beer that day. The victim stated that she last saw Tammy and Sandy at about 8:00 p.m. on June 9 and that, during the next two hours, she and defendant sat in her apartment and drank beer. Defendant told the victim he had some friends who were playing in a band at Jerry's II, a lounge. Defendant told her he wanted to go to the lounge to listen to the music and asked her if she would like to go.
At about 10:00 p.m. on June 9, the victim and defendant left the victim's home and went directly to Jerry's II, arriving there about ten minutes later. The victim drank about two beers at Jerry's II and danced with defendant. The victim did not kiss or hug defendant in the lounge, and she denied that she ever grabbed defendant in his crotch while they were there. They stayed at the lounge about 45-60 minutes and left, after the victim told defendant she wanted to go home. Along the way home, defendant told the victim he wanted to stop at his home and show her something. Defendant told her they would be there for only a second.
When the victim and defendant got to defendant's home, they exited his vehicle and went inside. At that point, defendant started "acting crazy," locking all the doors and turning off the lights. The victim asked defendant what he was doing, but defendant said nothing. Defendant pushed the victim into the bedroom. The victim kept asking defendant what he was doing and told him she wanted to go home. During this time, defendant continued to say nothing. Defendant leaned down on the side of the bed and produced a .38 handgun. He started "waving [the gun] around" and told the victim he was going to "blow [her] fucking brains out" if she did not do what he wanted her to do. At that point, he was pointing the gun at her head. Defendant grabbed the victim by her hair and proceeded to rape her. The victim was scared to death and did not struggle with defendant because of the weapon. After defendant removed her clothes and his clothes, he penetrated her vagina with his penis and ejaculated inside her. The victim stated that the sex was "rough." Defendant walked out of the bedroom. The victim managed to put her dress back on and proceeded toward the front door to exit as quickly as possible. When the victim got to the door, defendant jumped up, asked her where she thought she was going and vulgarly told her she was not going anywhere. Defendant then pushed the victim back into the bedroom and raped her vaginally a second time. Defendant again walked out of the bedroom. The victim got up and went into the living room to see if she could escape. The victim could hear defendant talking on the telephone. Defendant came back with a .410 shotgun, pointed it at the victim, told her to go back in the bedroom and stated: "I'll blow your fucking brains out." Defendant then raped the victim vaginally a third time. Thereafter, the victim asked defendant to take her home, having no intention of getting into defendant's car with him but only wanting him to open the door to facilitate her escape. Defendant told her he could not, because he had been drinking. The victim decided to try another strategy, asking defendant to call a taxicab to take her home. Defendant then telephoned a taxicab service, unlocked the door, and told the victim to meet the taxicab down the street. Still scared to death, the victim walked down the street. Tammy Baudoin drove up within a short time and began talking to the victim. When the taxicab driver came, the victim asked him to call the police. Within a few minutes, the police drove up.
Although defendant did not take the witness stand in his own defense at the second trial, the transcript of his testimony from the first trial revealed the following. On June 9, defendant received a telephone call from *1057 Tammy Baudoin, whom he had previously dated. Baudoin wanted defendant to help her move to another residence. Defendant did not agree to help, because he had previous plans to go to his mother's home and fry some fish. Later that evening, while defendant was at his mother's home, Baudoin, Sandy and the victim came there. They wanted defendant to help them move some of the heavier items, which defendant agreed to do. Defendant went to the Wood Street residence in his own car, and the other three left in Sandy's car. At the Wood Street location, the victim asked defendant to take her to her home to check on her son.
Defendant and the victim arrived at her home at about 7:30-8:00 p.m. While there, defendant talked to the victim. When Baudoin and Sandy arrived with the trailer, defendant helped them unload it. Inside Baudoin's apartment, the victim asked if she could go out with defendant, who agreed to let her. The victim left to go change her clothes. When the victim returned, she kissed defendant on the cheek in front of Baudoin. Defendant and the victim left in defendant's car at about 9:00-9:20 p.m. Defendant stopped at his home to get some money. While they were there, the victim used the restroom. From his home, he and the victim went to Jerry's II, arriving at shortly before 10:00 p.m. While at the lounge, he and the victim danced, hugged and kissed; and at some point, the victim "grabbed" defendant "in the crotch." They left the lounge at about 11:00 p.m. and went to defendant's home, where they had consensual sexual intercourse three times. Defendant denied that he put a gun to the victim's head and threatened to kill her if she did not have sex with him. He described the intercourse as "vigorous," "heavy sex." According to defendant, the victim kissed him on his neck and left a passion mark on each side of his neck. Defendant received two telephone calls from Baudoin, one at about 12:30 a.m. and another at approximately 1:30 a.m. Both times, Baudoin wanted to know what he and the victim were doing and what was going on. Baudoin asked to speak to the victim who declined to talk to her, and defendant so informed Baudoin. After defendant and the victim had sex the third time, defendant proceeded to go to sleep. At about 1:45 a.m., as defendant was about to doze off, the victim shook him and stated that someone was on the porch. Defendant retrieved his .38 and apparently investigated what she had said. Later, the victim asked defendant to bring her home. Defendant asked her if it was okay if he called a taxicab for her to which she agreed. Defendant asked her to meet the taxicab a couple of houses away so as not to cause his dogs to start barking and disturb his neighbors. Defendant opened the door, and the victim left to meet the taxicab. After the victim went outside, defendant heard Baudoin pull up, heard what sounded like arguing, looked outside and saw Baudoin and the victim arguing. Later, the police knocked on defendant's door. He was told to come outside and that he was under arrest. When the police told defendant about the allegation of rape, defendant denied it. Defendant signed a consent to search and told Officers Perkins and Williams about the passion marks while they were at defendant's home. Defendant stated that he did not know if the victim saw the.38. However, the shotgun was on the floor between his bed and the closet; and, while the victim was at his residence, defendant moved the shotgun.
The testimony given by Officers Freddie Williams and Roland Perkins revealed that, after defendant exited his home on the morning of June 10, defendant was advised of his rights and that defendant then denied raping the victim and stated that he and the victim had consensual sex. These oral statements were consistent with defendant's subsequent videotaped statement at the police station that same morning and the transcript of defendant's testimony from the first trial, which the state introduced into evidence at the second trial.
During the search of defendant's residence, the police seized a .38 handgun, a .410 shotgun, the victim's underpants and pantyhose, and the bedclothes and pillows from the bedroom where the victim was raped.
Dr. Randall Kenneth Lillich, who qualified and was accepted by the trial court as an expert in the field of emergency medicine, *1058 testified that the victim arrived at the hospital at about 3:35 a.m. on June 10, 1992, and that he physically examined her. He testified that the victim related to him that she had been raped between midnight and 2:00 a.m., and that her last sexual intercourse had been months before the rape. The victim's breath smelled of alcoholic beverage, but she was awake, alert, cooperative and fully oriented. Dr. Lillich stated that the victim was not impaired from alcoholic beverage consumption. He found bruises behind the victim's right ear and on her right shin. The doctor also found a "fresh," first degree, two centimeter tear of the victim's left labia minora and 50-60 petechia of the upper one half of the victim's vagina. He stated that a first degree tear is a "very shallow" tear and the most minor degree of tears, which are rated on a scale of first through fourth degree. During the examination, the doctor also found sperm in the victim's vagina, most of which were motile. According to Dr. Lillich, the presence of the petechia was consistent with the history related to him by the victim; but he indicated that the petechia could have been caused by very "rough consensual sex" or self-inflicted injury.
According to the victim, defendant ejaculated during each of the three rapes. She stated that five minutes elapsed between the first and second rapes and ten minutes between the second and the third rapes. At his first trial in November of 1992, defendant testified he was thirty-two years old. On cross-examination, Dr. Lillich opined that a man in the 29-39 age group would be able to ejaculate within thirty minutes of a prior ejaculation. Dr. Lillich stated that he was sure some individuals in the 28-32 age range would be able to ejaculate three times in a period of twenty minutes but that it would be "pretty tough, I'd say."
David Charles Parrio, a correctional officer at the Terrebonne Parish Sheriff's Office, testified that he saw defendant on or about June 10, 1992. Parrio testified that defendant pointed out to him some passion marks on defendant's neck, but Parrio did not recall the date of this occurrence. However, according to Parrio, at about 5:00 or 6:00 a.m. on June 10, 1992, he had observed two hickeys or passion marks on defendant's neck when defendant was being booked into the parish jail.
Claude I. Porche, who worked for the Terrebonne Parish Sheriff's Office at the jail, testified that on June 10, 1992, he came into contact with defendant. On two occasions in June of 1992, defendant showed him some hickeys on defendant's neck.
The testimony of Madeline Galliano, defendant's mother,[6] revealed that she was at home on the day before defendant's arrest, i.e. June 9, 1992, when defendant came to her home. Ms. Galliano got a good look at defendant before he left. On the following day, she was informed of defendant's arrest and went to the parish jail to see defendant that morning. On the preceding day, defendant did not have any hickeys or passion marks on his neck. However, when Ms. Galliano saw defendant on the morning of June 10, defendant had a hickey or passion mark on each side of the base of his neck.
Janice G. McGee, defendant's sister, testified that she saw defendant at her mother's house on June 9, 1992. She hugged defendant and got a good look at defendant's neck and did not notice any hickeys or passion marks on defendant's neck on June 9. On the morning of the following day after defendant's arrest, she accompanied her mother to the sheriff's office and noticed defendant had a hickey mark on each side of the base of his neck.
Later, on the afternoon of June 10, McGee went to defendant's house and obtained some telephone numbers that were displayed on defendant's call identifier. The call identifier showed there were four calls made to defendant on June 10, at 12:21 a.m., 1:11 a.m., 1:32 a.m. and 2:38 a.m. McGee stated that the first and third calls were from the same telephone number.
Bruce Peters, an employee of the Terrebonne Parish Coroner's Office, testified that on June 10, 1992, he spoke to the victim in connection with his investigation of her rape *1059 complaint. She was "kind of upset," mad, and had been crying. Peters detected an odor of alcoholic beverage about her breath. The victim told him she and defendant had gone out and had a few beers before going to defendant's home where she had a few more beers. The victim also told him that defendant wanted to have sex but that she did not and that defendant had a couple of guns and had "flashed them in front of her." In regard to defendant having flashed the weapons, Peters acknowledged he was "kind of paraphrasing" from his report.
Barbara Ann Cheramie, a registered nurse who had assisted in the rape examination of the victim, testified that the victim stated that she was forced to have sexual intercourse three times at gunpoint after a date.
Kelly Jean Melancon testified that, in June of 1992, she was working as a bartender at Jerry's II. She recalled defendant having been at the lounge with a female guest on June 9, 1992. Melancon stated that defendant and his guest were dancing, drinking and having a good time. Defendant and his guest were sitting together when they were not dancing and appeared to be affectionate toward each other. Melancon saw them hug and kiss, but she did not notice if defendant had any passion marks on his neck.
Concerning hickeys or passion marks, the victim denied she had made any such marks or hickeys on defendant during the incident. She stated that, at the time all her teeth had been pulled and, thus, that it would have been difficult for her to bite defendant. Officers Freddie Williams and Roland Perkins each testified that he did not see any hickeys or passion marks on defendant and that defendant had not pointed out any to him.
Initially, we note that the testimony of the victim alone is sufficient to prove the elements of an offense. State v. Orgeron, 512 So.2d 467, 469 (La.App. 1st Cir.1987), writ denied, 519 So.2d 113 (La.1988). The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Gordon, 582 So.2d 285, 292 (La.App. 1st Cir.1991). In finding defendant guilty of the responsive offense of forcible rape, it is obvious that the jury believed the testimony of the victim and other state witnesses and rejected the defense theory of consensual sexual intercourse. The credibility of the witnesses' testimony is a matter of weight of the evidence. A determination of the weight to be given evidence is a question of fact for the trier of fact not subject to appellate review. State v. Tate, 506 So.2d 546, 551 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
Viewing all the evidence in the light most favorable to the State, any rational trier of fact could have concluded that the state proved defendant's guilt beyond a reasonable doubt. Accordingly, this assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SIX
In this assignment, defendant contends that the trial court erred by imposing an unconstitutionally excessive sentence. Defendant cites various factors in support thereof, including his assertions of his first felony offender status and lack of any convictions or arrests involving aggression against another person.
The Code of Criminal Procedure sets forth items which must be considered by the trial court before imposing sentence. LSA-C.Cr.P. art. 894.1. The trial court need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the guidelines. State v. Herrin, 562 So.2d 1, 11 (La.App. 1st Cir.), writ denied, 565 So.2d 942 (La.1990). In light of the criteria expressed by Article 894.1, a review for individual excessiveness should consider the circumstances of the crime and the trial court's stated reasons and factual basis for its sentencing decision. State v. Watkins, 532 So.2d 1182, 1186 (La. App. 1st Cir.1988).
Although a sentence falls within statutory limits, it may be excessive. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). However, the trial court has great discretion in imposing a sentence within the statutory limits; and such a sentence will not be set aside as excessive in the absence of manifest *1060 abuse of discretion. State v. Latiolais, 563 So.2d 469, 473 (La.App. 1st Cir.1990).
Defendant's penalty exposure for the instant offense was imprisonment at hard labor for a minimum of five and a maximum of forty years, with at least two years of the sentence to be served without benefit of probation, parole, or suspension of sentence. See LSA-R.S. 14:42.1(B). Herein, defendant received a sentence of thirty-five years at hard labor without benefit of probation, parole, or suspension of sentence.[7]
In its initial sentencing remarks, the trial court noted that, at defendant's first trial, he was convicted of aggravated rape, which was reversed on appeal and that upon retrial defendant was found guilty of the responsive offense of forcible rape. The court took cognizance that defendant had a series of arrests and that, in regard to each arrest, defendant's rap sheet did not reflect any disposition. More specifically, the court noted the following arrests: a May 1, 1978, arrest for simple criminal damage to property and criminal trespass; an August 21, 1980, arrest for disturbing the peace by intoxication; a December 7, 1985, arrest for reckless operation of a vehicle, disturbing the peace, failure to maintain control and simple criminal damage to property; an October 22, 1986, arrest for simple battery and disturbing the peace; and a May 12, 1988, arrest for distribution of marijuana and distribution of a Schedule II controlled dangerous substance.
The trial court asked defendant if he wanted to inform the court of any mitigating factors prior to imposition of sentence. Defendant responded that he was not guilty of the charge but acknowledged that he had again been found guilty. The court told defendant that it understood that defendant maintained his innocence.
When the trial court asked defense counsel if she had anything to say to the court, she made an oral presentation on defendant's behalf. Defense counsel noted that defendant had been incarcerated for about four years, during which time he had been a model prisoner. Counsel further noted that defendant had increased his education level and was close to attaining a GED and that she felt defendant could be a productive member of society.
In articulating additional sentencing reasons, the trial court stated that, as always, it is difficult to determine an appropriate sentence in a particular case. The court stated that it had considered the nature of the instant offense. The court noted that it had listened to the comments of defendant and defense counsel and had considered those comments in light of the sentencing provisions of LSA-C.Cr. P. art. 894.1 and the sentencing guidelines promulgated by the Louisiana Sentencing Commission.[8] The court commented that it had presided over both of defendant's trials and had gathered from the victim's testimony in both trials that she still seems to be truly frightened of defendant. The court stated that testimony given in the case bore out that both the victim and defendant had been consuming alcoholic beverages and that the victim's consumption of alcohol could have made her more vulnerable to the sexual desires of defendant. The court commented that the evidence was clear that weapons were used in connection with the rape and that the court felt the use of weapons created the possibility of serious bodily harm or even death to the victim. The court stated that it appeared to the court that defendant's conduct on the night in question had made a "permanent mark" on the victim, one from which she may never fully recover. Acknowledging that defendant denies any wrongdoing, the court indicated that it was not aware of any fact brought out in testimony that the court could consider as a justification for the events constituting *1061 the offense. The court stated that it did not feel that defendant was in any way provoked or that the victim was a willing participant in the acts committed against her. The court further stated that it felt that defendant was the aggressor, used threats and had the apparent ability to carry out those threats. Finally, the court took cognizance of the seriousness of defendant's crime against the victim.
Based on the record before us, and particularly considering the sentencing reasons articulated by the trial court, this near maximum sentence is not a needless imposition of pain and suffering upon this particular defendant and in no way shocks our sense of justice. Accordingly, we find no abuse of discretion by the court in imposing a sentence of thirty-five years at hard labor without benefit of parole upon defendant for this particular crime.
This assignment lacks merit.
CONVICTION AND SENTENCE AFFIRMED.
FITZSIMMONS, J., concurs in the result.
NOTES
[1] Judge Ralph Tyson is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The record reflects that Henry Aycock died after defendant's first trial. However, Aycock's testimony from the first trial was introduced into evidence by the state at defendant's second trial.
[3] The scope of a Batson claim has been extended to other "suspect classifications," such as gender. See J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 141, 114 S.Ct. 1419, 1428, 128 L.Ed.2d 89 (1994).
[4] In his brief, defendant refers to pages of the trial transcript corresponding to the above quoted exchange in support of assignment of error number two.
[5] In addressing defendant's assignment of error number three, we choose to review the suppression hearing transcript from defendant's first trial even though under ordinary principles of appellate review we might not be compelled to do so. See State v. Brooks, 505 So.2d 714, 721-722(La.), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Lee, 577 So.2d 134, 142 n. 13 (La.App. 1st Cir.), writ denied, 580 So.2d 667 (La.1991). Furthermore, in addressing assignment of error number three, we are not limited to the evidence adduced at the suppression hearing; we will consider all pertinent evidence given at defendant's second trial. See State v. Chopin, 372 So.2d 1222, 1223 n. 2 (La.1979).
[6] The record reflects that Madeline Galliano died after defendant's first trial. At his second trial. defendant introduced into evidence her testimony from the first trial.
[7] We note that defendant's assertion that LSA-R.S. 14:42.1(B) provides for denial of probation, parole or suspension of sentence for only the first two years of a forcible rape sentence is completely erroneous and ignores the clear wording of the statute, which provides for the denial of such benefits for a minimum of two years.
[8] We note that the former requirement of LSA-C.Cr. P. art. 894.1(A) that a court consider the Commission's guidelines was repealed effective August 15, 1995, by 1995 La. Acts, No. 942, § 1. Thus, although the trial court noted it had considered the Commission's guidelines, the former requirement was inapplicable to defendant's sentencing which occurred on May 16, 1996.